UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GLENN CARMACK,                      )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       No.  4:13 CV 562 DDN
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
                Defendant.          )


## MEMORANDUM

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying Glenn Carmack's applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  For the reasons that follow, the decision of the Commissioner is reversed.

## I.  Procedural History

Plaintiff Glenn Carmack applied for DIB and SSI on December 1, 2005, claiming that he became disabled on September 15, 2005, because of hepatitis C, bipolar disorder, and two bulging discs in his back.   Upon initial review, the Social Security Administration denied plaintiff's claims for benefits after which, upon plaintiff's request, a hearing was held before an administrative law judge (ALJ).  On July 10, 2008, the ALJ issued a decision denying plaintiff's claims for benefits.  After the Appeals Council denied plaintiff's request for review of the ALJ's decision, plaintiff filed a civil action in this Court seeking judicial review.  *See Carmack v. Astrue,* Cause No. 4:10CV373 SNLJ/DDN (E.D. Mo. 2010).  On August 24, 2011, United States District Judge Stephen

N. Limbaugh, Jr., remanded the matter to the Commissioner with instruction for the ALJ on remand to reassess Dr. Sicuro's opinion in light of the correct interpretation of his Global Assessment of Functioning (GAF) score, and to clearly articulate the medical evidence supporting the residual functional capacity (RFC) assessment. Cause No. 4:10CV373 SNLJ/DDN (E.D. Mo. Aug. 23, 2011) (Doc. #24) (order & judgment). Upon receipt of Judge Limbaugh's Order, the Appeals Council issued a separate Order instructing the ALJ to offer plaintiff an additional hearing, take any further action to complete the administrative record, and issue a new decision. (Tr. 527.)

On November 27, 2012, the ALJ conducted a supplemental hearing at which plaintiff and a vocational expert testified. (Tr. 424-43.) On January 22, 2013, the ALJ issued a decision finding plaintiff disabled as of May 21, 2012, but not prior to that date. (Tr. 399-416.) Plaintiff did not seek Appeals Council review of this decision, and the record contains no notice that the Appeals Council conducted its own review. As such, pursuant to the Notice of Decision provided to plaintiff, the ALJ's decision of January 22, 2013, became the Commissioner's final decision sixty-one days after its issuance. (*See* Tr. 400.) This civil action seeks judicial review of this final decision. 42 U.S.C. § 405(g).

In this action, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred by discounting the opinions of all of his treating physicians resulting in an RFC determination unsupported by medical evidence. Plaintiff also claims that by discounting his treating physician's Hepatitis C RFC Questionnaire, the ALJ erroneously determined his hepatitis not to be a severe impairment. Plaintiff also contends that the ALJ failed to discuss why his back impairment did not meet Listing 1.04A prior to May 21, 2012, and specifically, why a January 2007 MRI did not support such a finding. Because of these alleged errors, plaintiff claims that the resulting RFC was flawed and provided an improper basis upon which to pose a hypothetical question to the vocational expert. Plaintiff requests the Court to remand the matter to the Commissioner for further consideration.

## II. Testimonial Evidence Before the ALJ

A.      Hearing Held June 19, 2009[1]

At the hearing on June 19, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff was forty-one years of age at the time of the hearing. He completed the seventh grade, after which he began working. He has never tried to get his GED. He last worked as a chef at Rizzo's in 2007. He applied for and received unemployment benefits in 2007 and the first quarter of 2008. (Tr. 27-28.)

Plaintiff testified that he was fired from Rizzo's in 2005 because they discovered he had hepatitis C, and he was unable to perform his duties and was not dependable. His stepfather owned Rizzo's. After he was fired in 2005, his stepfather gave him a break by letting him return. Ultimately, however, he could not perform the duties and did not appear for work regularly because of his ailments. (Tr. 33, 36-37.)

Plaintiff testified that he was diagnosed with hepatitis C and began Interferon treatment in 2001 or 2002. He was cured for six months before the hepatitis returned, and he had to wait to begin the treatment again. (Tr. 28-29.) Plaintiff testified that the condition makes him tired all the time and makes him vomit periodically, although he is usually sick in the mornings. He sometimes sleeps for days at a time. Hepatitis C precludes him from cooking in a restaurant. He cannot take Interferon currently because he is bipolar. He testified that his drug and alcohol abuse did not hinder his treatment. (Tr. 32, 37-38.)

Plaintiff testified that he also suffers from chronic back pain. Therapy and injections made his pain worse, so he manages his pain through medications and little exercises. His back pain radiates from his lower back to both legs, with the pain more intense in his left leg. He also takes Coumadin to combat blood clots in his arms and

---

[1] In a Report and Recommendation entered in the previous case, the undersigned summarized the testimony adduced at the administrative hearing held on June 19, 2009. (*See* Cause No. 4:10CV313 SNLJ/DDN, Doc. #23 at pp. 18-19.) Such summary is restated here.

neck.  (Tr. 33-35.)  Plaintiff testified that the Coumadin could cause him to bleed to death if he is bruised or cut.  (Tr. 39.)

Plaintiff testified that he was previously convicted of illegally possessing pain pills that were not prescribed to him, and he was sentenced to five years' probation.  Plaintiff testified that he presently had two years of probation remaining.  He used heroin and cocaine in the past.  He testified that he last used heroin one to two years prior and last used cocaine seven to eight months prior.  Plaintiff later admitted that he used cocaine as recently as three months before the hearing.  He never used marijuana and had not used any other illegal street drugs in the last twenty years.  Plaintiff testified that drug screens conducted in May 2008 returned with negative results.  (Tr. 30-31.)

Plaintiff testified that he suffers from depression and panic attacks, which cause him to stay in his house, sleep often, become distracted, and interrupt his concentration. He once lost his prescription medications when one of his daughter's friends stole them. (Tr. 34-35.)  With respect to his positive drug tests, plaintiff testified that he had relapsed for a few days after becoming depressed and suicidal.  He experiences severe mood swings and occasionally fought in the kitchen when he worked.  (Tr. 38-39.)

B.      Hearing Held on November 27, 2012

1.      *Plaintiff's Testimony*

At the time of the hearing on November 27, 2012, plaintiff was forty-five years of age.  (Tr. 427.)

Plaintiff testified that his back pain worsened in May 2012 when he fell down some stairs.  Plaintiff testified that steroid injections he currently receives every other week help the pain for about three or four days, but that the injection therapy seemed to worsen his pain overall.  (Tr. 430-31.)

Plaintiff testified that he began seeing Dr. Stotler, a psychiatrist, when he experienced periods of depression lasting for three or four days during which time he felt suicidal.    (Tr.  434-35.)    Plaintiff  testified  that  Dr.  Stotler  recently  changed  his psychotropic  medications  because  he  began  experiencing  manic  episodes.    Plaintiff testified  that  he  usually  experienced  only  depressive  episodes.    (Tr.  432.)    Plaintiff

testified that he had been compliant with his medications recently, and that he had been admitted to the psychiatric ward in the past when he was not so compliant. Plaintiff testified that he continued to have problems with concentration and his ability to focus, as shown by his missing doctors' appointments. (Tr. 435.)

Plaintiff testified that positive results from a drug screening in July 2012 were likely from his medications. To the extent the test yielded positive results for marijuana, plaintiff testified that he had not used marijuana for twenty years. (Tr. 432-33.)

2.    *Vocational Expert Testimony*

Dr. Gerald Belchick, a vocational expert, testified at the hearing on November 27, 2012, in response to questions posed by the ALJ and counsel.

The ALJ asked Dr. Belchick to consider a person thirty-eight years of age[2] with a seventh grade education and past relevant work as a cook. The ALJ asked Dr. Belchick to further assume the person to be able to

> lift and carry 20 pounds occasionally, 10 pounds frequently, stand or walk for six hours out of eight, sit for six, can occasionally climb stairs and ramps, never ropes, ladders, and scaffolds, plus occasionally stoop, kneel, and crouch. He should avoid concentrated exposure to vibration and unprotected heights. In addition, this hypothetical claimant is able to understand, remember, and carry out at least simple instructions and undetailed tasks, can demonstrate adequate judgment to make simple work-related decisions, can respond appropriately to supervisors and co-workers, and can adapt to routine, simple work changes.

(Tr. 437-38.) Dr. Belchick testified that such a person could not perform plaintiff's past work as a cook inasmuch as such work is classified as skilled and medium. Dr. Belchick testified that such a person could perform other work, such as single item cashiering, of which 11,000 such jobs exist in St. Louis and 981,000 nationally; and inner-office mail clerk, of which 2,100 such jobs exist in St. Louis and 78,000 nationally. (Tr. 438-39.)

The ALJ then asked Dr. Belchick to assume the same individual, except that the person was limited to lifting and carrying ten pounds occasionally and less than ten pounds frequently; and was limited to standing and walking two hours out of an eight-

hour workday and sitting for six hours out of an eight-hour workday. Dr. Belchick testified that such a person could perform work as a bench assembler, of which 1,700 such jobs exist in St. Louis and 60,000 nationally; and bench packager, of which 1,100 exist in St. Louis and 14,000 nationally. (Tr. 439-40.)

In response to counsel's questions, Dr. Belchick testified that a person who was limited to sitting for less than two hours and standing and walking for less than two hours in an eight-hour workday could not maintain competitive employment. Likewise, Dr. Belchick testified that a person who would be absent from work more than four days a month or who would take eight twenty-minute unscheduled rest breaks during the day could not maintain competitive employment. Finally, Dr. Belchick testified that a person with chronic tardiness, inconsistency with attendance, poor focus, and an inability to maintain attention for two-hour segments would be unemployable. (Tr. 440-42.)

## III. Summary of Medical Evidence from Prior Proceeding[3]

On March 22, 2004, plaintiff saw Bruce Baskir, M.D., for treatment of seasonal allergies. Dr. Baskir noted that plaintiff suffered from hepatitis C and had recurring chemical dependence. (Tr. 196.)

On May 3, 2004, plaintiff was seen by Heather White, M.D. Dr. White noted that plaintiff had a liver biopsy, had been diagnosed six years prior with hepatitis C, had Interferon and Ribavirin treatment with no response, and had been prescribed PEG/Ribavirin in the past year. Dr. White also noted plaintiff's prior cocaine, heroin, and Methadone abuse, and that plaintiff suffered from some fatigue. Dr. White diagnosed plaintiff with hepatitis C but did not believe that he was a good candidate for

---

[2] Plaintiff was thirty-eight at the time of the alleged onset of disability.

[3] In the Report and Recommendation entered in the previous case, the undersigned summarized in detail the medical evidence of record. This medical evidence is likewise a part of the administrative record presently before the Court for review. The undersigned restates here the summary of this evidence from the earlier Report and Recommendation

prescription treatment because of his recent drug use and psychiatric history. (Tr. 183-84.)

In a letter to Dr. Baskir dated May 5, 2004, Dr. White noted that plaintiff had been treated with Interferon by Barbara Dixon Scott, but had never really successfully completed a trial of pegylated Interferon with Ribavirin. Dr. White also noted that plaintiff had been an active drug user until three months prior, which may have hindered the efficacy of his treatment. Dr. White reported that she told plaintiff that he would need to stop using drugs for six months before he could be treated. Dr. White recommended that plaintiff follow up with a psychiatrist, Dr. Franco Sicuro; maintain his sobriety; and have lab work done. Dr. White also noted that plaintiff was scheduled to have an ultrasound to look for focal lesions, and that plaintiff may need hepatitis A and B vaccinations. (Tr. 162.)

On September 2, 2004, Dr. White noted that plaintiff had gotten drunk three weeks prior, took pain medications, and did not feel mentally ready for medications. Dr. White diagnosed plaintiff with hepatitis C and noted that plaintiff wanted to start over with a liver biopsy. Dr. White recommended that he contact his psychiatrist. (Tr. 177.)

On September 7, 2004, plaintiff saw Dr. Baskir for back pain and left leg pain radiculopathy. Plaintiff also reported suffering from fatigue. Dr. Baskir gave plaintiff samples of Vicodin.[4] (Tr. 195.) X-rays taken of plaintiff's lumbosacral spine on September 13 revealed no abnormalities. (Tr. 203.)

On September 21, 2004, Dr. Baskir noted that plaintiff continued to suffer from back pain and left leg radiculopathy. Dr. Baskir continued plaintiff's Vicodin prescription. (Tr. 194.)

An MRI taken of plaintiff's lumbar spine on October 4, 2004, revealed a disc bulge, eccentric to the left at L4-5, resulting in mild left lateral recess stenosis; as well as

---

[4] Vicodin (Hydrocodone) is an opiate analgesic used to relieve moderate to severe pain. *Medline Plus* (last revised May 15, 2013),<http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a601006.html>.

a diffuse disc bulge with a more focal protrusion to the right at L5-S1, resulting in mild right lateral recess stenosis. (Tr. 201-02.)

On October 11, 2004, Dr. Baskir noted that plaintiff continued to complain of left leg pain, leg numbness, and pain when walking. Dr. Baskir prescribed Hydrocodone. (Tr. 194.)

On November 2, 2004, plaintiff reported to Dr. Baskir that his pain had not improved. Plaintiff was told to see Dr. Smith, a neurosurgeon. Dr. Baskir noted that plaintiff was taking Vicodin and that straight leg raising was positive on the left. Dr. Baskir diagnosed plaintiff with left leg radiculopathy and authorized a refill of Hydrocodone. (Tr. 193.)

On November 11, 2004, Kenneth R. Smith, Jr., M.D., reported to Dr. Baskir that he had examined plaintiff that same date. Dr. Smith wrote that plaintiff had left sciatica starting at his hip and moving to his foot, and that plaintiff reported having such condition for two to three months with no inciting incident. Dr. Smith noted that plaintiff had responded fairly well to Vicodin despite occasional numbness, and was able to continue working. An extensive review of plaintiff's MRI films showed a bulging disc at L4-L5. Dr. Smith diagnosed plaintiff with disc disease and opined that plaintiff needed a Warm-and-Form back brace, a back book, exercises, pain medication, and follow-up visits with Dr. Baskir. (Tr. 163.)

On November 15, 2004, plaintiff told Dr. Baskir that he lost his medications in his luggage. Dr. Baskir authorized a Hydrocodone refill. (Tr. 193.)

On December 28, 2004, plaintiff saw Dr. Baskir for leg pain, lower back pain, and numbness in his hands at night. Dr. Baskir noted that plaintiff had seen Dr. Smith for chronic back pain. Dr. Baskir authorized a refill of Vicodin. (Tr. 192.)

On January 3, 2005, Sarah Keller, P.T., examined plaintiff's back. Plaintiff rated his pain as a constant 5/10 and reported no functional restrictions. Ms. Keller viewed plaintiff as a good rehabilitation candidate and opined that, by being seen twice weekly for four weeks for physical therapy, he would increase his flexibility and strength so that

he could stand for long periods of time while working without an increase in pain. (Tr. 164-66.)

On February 11, 2005, Dr. Baskir was called by a pharmacy when plaintiff requested a Vicodin refill. Dr. Baskir denied the refill and told plaintiff to see him. On February 18, plaintiff visited Dr. Baskir and reported that he had attended physical therapy for back pain but still suffered from chronic pain. Dr. Baskir authorized a refill of Vicodin. (Tr. 192.)

On March 28, 2005, plaintiff saw Dr. Baskir and complained of pain in his lower back. Dr. Baskir noted plaintiff's lumbar disc problems and that plaintiff would have surgery as soon as he obtained insurance that would cover it. Dr. Baskir refilled plaintiff's Vicodin. (Tr. 191.)

On May 20, 2005, plaintiff reported to Dr. Baskir that he had been involved in a motor vehicle accident. Dr. Baskir diagnosed a soft tissue injury, possibly a disc herniation, and prescribed Hydrocodone. (Tr. 191.)

On June 21, 2005, Dr. Baskir noted that plaintiff's leg was improving with exercise, but his back was still painful. Plaintiff was waiting for insurance before scheduling back surgery. Dr. Baskir noted disc herniation and prescribed Hydrocodone. (Tr. 190.)

On September 30, 2005, plaintiff saw Dr. Sicuro for suicide complaints after he had been on a heroin and cocaine binge. Dr. Sicuro noted that plaintiff suffered from bipolar disorder, hepatitis C, and polysubstance dependence. Plaintiff told Dr. Sicuro that he had not been taking his Seroquel at night; that he had been on a binge of intravenous heroin and cocaine; that he had emptied his bank account; that he was thrown out of his job; that he had been thrown out of his house because his wife could not tolerate his drug abuse; and that he had been driving around since five o'clock that morning with a gun in his truck before deciding to seek help. Dr. Sicuro noted that plaintiff was alert, oriented, and cooperative and that his affect was intense. Plaintiff's mood was noted as anxious

and irritated. Dr. Sicuro assigned plaintiff a GAF score of 30[5] and planned for plaintiff to resume Seroquel, start Suboxone, and start detoxification from heroin. (Tr. 167-68.) An admission note that same date from the psychiatric unit at DePaul Health Center contained diagnoses of bipolar disorder, now depressed; polysubstance abuse; and abnormal EKG. (Tr. 204.)

On November 21, 2005, plaintiff saw Dr. Baskir for a medication refill. Dr. Baskir noted that plaintiff felt better with weight loss, and he refilled plaintiff's Vicodin. (Tr. 189.)

On December 14, 2005, plaintiff saw Dr. Baskir for complaints of chronic pain. On January 11, 2006, plaintiff saw Dr. Baskir for complaints of chronic back pain and pain when lifting, standing for prolonged periods of time, and sitting. On February 15, plaintiff saw Dr. Baskir for treatment of a finger lesion and chronic pain. On April 7, plaintiff saw Dr. Baskir for complaints of chronic back pain. On each of these visits, Dr. Baskir authorized the refill of plaintiff's Vicodin prescription. (Tr. 187-88, 216.)

On February 22, 2006, plaintiff completed a Function Report-Adult for disability determinations. Plaintiff wrote that he drove his daughter to and from school, did small chores around the house, watched television, helped his daughter with her homework, listened to music, and slept. He also wrote that he took care of and raised his daughter, fed and walked his pets, had no personal care limitations, was able to prepare meals daily, was able to do laundry daily, and drove to shop for groceries and school supplies. He also wrote that he woke up every few hours at night when trying to sleep, could lift twenty pounds, experienced back pain when he walked one-quarter mile or stood for thirty minutes, could pay attention for a couple of hours at a time, and was always nauseous and tired. (Tr. 118-25.)

_____

[5] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 21-30 indicates behavior considerably influenced by delusions or hallucinations, or a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed

On May 5, 2006, D. Babcock, a medical consultant with disability determinations, completed a Physical RFC Assessment in which s/he opined that, with his two bulging discs and hepatitis C, plaintiff had the RFC to: 1) occasionally lift and/or carry twenty pounds; 2) frequently lift and/or carry ten pounds; 3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; 4) sit with normal breaks for a total of about six hours in an eight-hour workday; and 5) push and/or pull including operation of hand/foot controls, limited in lower extremities. Consultant Babcock opined that plaintiff: 1) would be limited to light work due to his conditions; 2) would occasionally have difficulty climbing, balancing, stooping, kneeling, crouching, and crawling; 3) had no manipulative limitations; 4) had no visual limitations; 5) had no communicative limitations; and 6) had no environmental limitations. Consultant Babcock also found plaintiff's complaints of pain credible but that he was otherwise only partially credible because he was able to drive his child to school and able to work in a kitchen - despite his condition - until he was laid off. (Tr. 205-11.)

On June 14, 2006, plaintiff saw Dr. Baskir for allergies and chronic pain. Dr. Baskir refilled plaintiff's Vicodin prescription for pain. (Tr. 215.)

A stress test performed on July 6, 2006, for evaluation of coronary artery disease yielded negative results for ischemia and caused no chest discomfort. (Tr. 212.)

On July 12, 2006, plaintiff saw Dr. Baskir for chronic pain. Dr. Baskir increased plaintiff's Vicodin dosage and noted that plaintiff was trying to get into a pain clinic. (Tr. 214.)

Plaintiff returned to Dr. Baskir on October 4, 2006, for chronic pain, who noted that plaintiff was going to see Dr. White the next day to initiate Interferon treatment. Dr. Baskir authorized a refill of plaintiff's Vicodin prescription. (Tr. 239.)

On October 6, 2006, Dr. Sicuro completed a Mental RFC Questionnaire. Dr. Sicuro diagnosed plaintiff with bipolar disorder and assigned a GAF score of 60. Dr. Sicuro noted plaintiff's highest GAF score of the year was 65 and that plaintiff was

all day; no job, home, or friends).

taking Seroquel and "doing ok." [6]  Plaintiff had only minor side effects from medication that may have had implications for working, although he was moody, anxious, had insomnia, and was guarded.  The signs and symptoms listed in the Questionnaire that Dr. Sicuro marked as present were:  1) decreased energy; 2) impairment in impulse control; 3) emotional instability; 4) generalized persistent anxiety; 5) mood disturbance; 6) difficulty thinking or concentrating; 7) psychomotor agitation or retardation; 8) persistent disturbances of mood or affect; 9) apprehensive expectation; 10) easy distractibility; 11) substance dependence; 12) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; and 13) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.  Regarding plaintiff's ability to do unskilled work, Dr. Sicuro marked that plaintiff was unable to meet competitive standards in:  1) maintaining regular attendance and being punctual within customary, usually strict, tolerances; 2) sustaining an ordinary routine without special supervision; 3) working in coordination with or proximity to others without being unduly distracted; 4) performing at a consistent pace without an unreasonable number and length of rest periods; 5) responding appropriately to changes in a routine work setting; and 6) dealing with normal work stress.  Dr. Sicuro explained that plaintiff had a very labile mood, was anxious, and was unable to endure stress.  Dr. Sicuro also marked that plaintiff was unable to meet competitive standards of dealing with the stress of semiskilled and skilled work, and was unable to meet competitive standards of interacting with the general public.  Dr. Sicuro also reported that plaintiff:  1) did not have a low IQ or reduced intellectual functioning; 2) suffered from

---

[6]  A GAF score of 51 to 60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  A GAF score of 61 to 70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

lower back pain; 3) would miss three days of work each month on account of his impairments or for treatment; 4) was not a malingerer; and 5) experienced the limitations described since 2004.  (Tr. 220-24.)

On November 14, 2006, Dr. Baskir noted that plaintiff had not started Interferon but was going to see Dr. White in December.  Dr. Baskir authorized a refill of Vicodin for plaintiff's chronic pain.  (Tr. 239.)

On November 30, 2006, plaintiff visited the Pain Management Center.  An assessment revealed that he could cook, clean, bathe, and shop alone, but that his daughter helped him at home.  The assessment also stated that:  1) plaintiff suffered from lower back pain since 2002; 2) he complained of pain in his lower lumbar with radiation to his buttocks and occasional numbness in his hands and feet; 3) Vicodin improved the pain; and 4) his pain worsened with activity, standing for long periods of time, and lying down.  Diagnoses were lumbago, tobacco abuse, hepatitis C, cervical spondylosis, displaced cervical spine, and bipolar disorder.  Treatment plans were physical therapy, a lumbar epidural steroidal injection at L4-5 versus L5-S1, psychiatric referral for bipolar disorder, and follow up with gastroenterology for hepatitis C.  Injections, reimaging, and new medications were considered for the future.  (Tr. 285-92.)

Plaintiff failed to appear for a scheduled appointment with Dr. White on December 7, 2006.  Dr. White noted that plaintiff had missed four appointments in the last twelve months and would be told at the next scheduling that he would not be permitted to miss any more appointments.  (Tr. 254.)

A Washington University Teaching Physician Note dated December 8, 2006, showed plaintiff's diagnoses to include displaced lumbar disc, right sided sciatica, tobacco abuse, and bipolar disorder.  (Tr. 292.)

On December 15, 2006, plaintiff saw Dr. Baskir for chronic pain who noted that plaintiff had seen Dr. White ten days prior but had not yet started Interferon.  Dr. Baskir also noted that plaintiff was going to the pain clinic and was to get an MRI.  Dr. Baskir authorized a refill of plaintiff's Vicodin prescription.  (Tr. 238.)

On December 27, 2006, plaintiff was admitted to the DePaul Health Center with

diagnoses of manic bipolar disorder, polysubstance abuse and dependence, and hepatitis C. He was assigned a GAF score of 10 on admission.[7] (Tr. 226.) The results of a drug screen panel administered that same date were positive for Methadone and cocaine use. (Tr. 242.) Plaintiff was discharged on January 4, 2007. His mental status examination on discharge revealed that he was alert, oriented, and cooperative; his affect was intact; his mood was moderately irritable; his thinking process was repetitive; he had no intention of harming himself or others; his condition was intact; and his insight and judgment were fair. He was assigned a GAF score of 50[8] upon discharge and was directed to follow up with Dr. Sicuro within a month and to join a drug rehabilitation program. (Tr. 226.)

On January 12, 2007, Dr. Baskir completed a Hepatitis C RFC Questionnaire wherein he reported that plaintiff's hepatitis C was not symptomatic and that plaintiff's prognosis was good. Dr. Baskir also indicated that plaintiff's symptoms and signs were chronic fatigue, weakness, nausea/vomiting, and muscle and joint aches. Dr. Baskir noted that plaintiff was being treated with Interferon. Dr. Baskir also noted that plaintiff suffered from depression and that he was incapable of tolerating work stress from even "low stress" jobs because of his depression and bipolar disorder. Dr. Baskir opined that plaintiff could: 1) walk three city blocks without rest or severe pain; 2) sit for up to one hour at a time; 3) stand for two hours at a time; 4) sit for less than two hours and stand/walk for about two hours total in an eight-hour workday; and 5) work twenty hours a week. Dr. Baskir also opined that plaintiff needed a job that permitted shifting positions at will between sitting, standing, and walking, and that plaintiff's pain and fatigue would cause him to need six unscheduled breaks in an average eight-hour workday with ten minutes of rest before returning to work. Dr. Baskir further opined that plaintiff could: 1) occasionally lift ten pounds or less; 2) never lift more than twenty

_____

[7] A GAF score of 1-10 indicates a persistent danger of severely hurting self or others (*e.g.*, recurrent violence), a persistent inability to maintain minimal personal hygiene, or a serious suicidal act with clear expectation of death.

[8] A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social,

pounds; 3) never twist, stoop, or crouch; 4) rarely climb ladders; and 5) occasionally climb stairs. Dr. Baskir noted no significant limitations with reaching, handling, or fingering, but that plaintiff could use his hands and fingers for only ten percent of an eight-hour workday, and his arms for only fifty percent of an eight-hour workday. Dr. Baskir opined that plaintiff would miss more than four days each month due to his impairments or treatment. Additional work limitations included plaintiff's inability to handle food due to hepatitis C, and avoiding sharp objects and heavy contact because he was taking Coumadin. (Tr. 232-36.)

Dr. Baskir's progress notes from January 12, 2007, state that plaintiff had become depressed, went on a cocaine binge, and was hospitalized for nine days. Dr. Baskir also noted that plaintiff had a clot in his right arm and that he was awaiting results from an MRI. Dr. Baskir further noted that plaintiff was to see Dr. White for his hepatitis C. Plaintiff complained of constant fatigue, hepatitis C, chronic back pain, and intermittent tingling in his fingers. (Tr. 237.)

An MRI of plaintiff's lumbar spine on January 18, 2007, showed a small asymmetric left posterior disc bulge at L4-L5. The bulge did not cause any significant central canal or neural foraminal stenosis, although there was mild bilateral facet arthropathy noted. The MRI also revealed a small posterior central broad-based disc herniation with an associated annular fissure at the L5-S1 level. This caused moderate narrowing of the bilateral neural foramina, although there was no central canal stenosis. Based on these findings, Tammie Benzinger, M.D., diagnosed mild lumbar spondylosis with focal posterior disc herniation at L5-S1. (Tr. 258.) A corresponding Medical Record Note stated that the MRI revealed a herniated disc at L5-S1. (Tr. 262.)

Plaintiff visited Dr. White on January 19, 2007, who noted that she had not seen plaintiff since September 2004. Dr. White noted plaintiff's history of hepatitis C as well as his history of drug dependence, including a relapse in December that plaintiff reported was associated with suicidal ideation precipitating an admission to DePaul's psychiatric service. Plaintiff also reported having regular lab work through Dr. Baskir because of

occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

right upper extremity deep vein thrombosis related to his drug use, which was diagnosed in December. Plaintiff expressed interest in treating his hepatitis, but Dr. White advised him that he needed to be clean and sober for at least six months before pursuing treatment and that he would need to undergo a liver biopsy. It was noted that the biopsy would be complicated because of his anticoagulation therapy. Dr. White also noted plaintiff complained of being severely fatigued and unable to work. (Tr. 250-53.)

An ultrasound of plaintiff's liver performed January 23, 2007, revealed chronic hepatitis C and cholelithiasis,[9] but the liver and bile ducts appeared normal. (Tr. 272.)

In a note addressed to "To Whom It May Concern" dated February 14, 2007, Dr. Sicuro stated that plaintiff had been a patient at Long Term Psychiatric Management, PC, since September 2004; that plaintiff was in detox there from December 26, 2005, through January 5, 2007; and that plaintiff was currently taking Methadone[10] as prescribed by Dr. Sicuro. (Tr. 256, 307.) Progress notes from Dr. Sicuro that same date reported that plaintiff was not suicidal or homicidal, had a neutral affect and neutral mood, and suffered from bipolar disorder and opioid abuse. (Tr. 308.)

On February 23, 2007, Dr. Baskir diagnosed plaintiff with deep vein thrombosis, hepatitis C, and positive PPD. (Tr. 274.)

On April 2, 2007, Anthony Eidelman, M.D., wrote to Dr. Baskir regarding plaintiff's low back pain and sciatica. Dr. Eidelman noted an MRI to show a small disc herniation at the L5-S1 level and mild lumbosacral spondylosis. Dr. Eidelman opined that a multidisciplinary treatment approach would be most effective, consisting of non-opioid analgesics and strengthening and conditioning exercises. Understanding that Dr. Baskir had stopped prescribing Vicodin, Dr. Eidelman agreed with this decision. Dr.

---

[9] Cholelithiasis is the presence of concentrations in the gallbladder or bile ducts. *Stedman's Medical Dictionary* 366 (28th ed. 2006).

[10] Methadone is an opiate analgesic used to relieve moderate to severe pain. *Medline Plus* (last reviewed Feb. 1, 2009), <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html>.

Eidelman planned to schedule plaintiff for an epidural steroid injection if conservative therapy proved ineffective. (Tr. 270.)

On April 10, 2007, Dr. Baskir again diagnosed plaintiff with hepatitis C, deep vein thrombosis, and chronic pain. (Tr. 276.)

On April 11, 2007, Dr. Sicuro noted that plaintiff was not using drugs, had no suicidal or homicidal thoughts, and had a normal affect and anxious mood. Dr. Sicuro diagnosed plaintiff with bipolar disorder and opioid dependence. (Tr. 306.)

On April 25, 2007, plaintiff visited the Pain Management Center for complaints of lower back pain and occasional shooting pain in his legs. A bilateral L5-S1 epidural steroid injection was administered, and plaintiff was told to continue taking Methadone per Dr. Sicuro's instructions. (Tr. 295-96.)

On June 13, 2007, Dr. Sicuro noted that plaintiff complained of severe pain and had occasional suicidal thoughts. Dr. Sicuro also noted plaintiff's blunted affect and anxious mood, but that he was not homicidal or suicidal. (Tr. 305.)

On June 19, 2007, plaintiff went to the DePaul Emergency Room after he suffered first degree burns when he opened the radiator cap of a car he was repairing. He reported suffering from two bulged discs in his back for three years; a history of bipolar disorder, drug abuse, depression, and suicidal ideation; and that he smoked three packs of cigarettes daily for the last twenty years. His burns were treated, and he was discharged. (Tr. 312-20.)

On July 11, 2007, plaintiff saw Dr. Baskir for complaints of fatigue and deep vein thrombosis. (Tr. 326.) On August 28, plaintiff told Dr. Baskir that he wanted to quit smoking. Plaintiff also complained of chronic pain. (Tr. 327.) On September 26, Dr. Baskir reported that plaintiff suffered from deep vein thrombosis and chronic pain. (Tr. 328.)

Dr. Baskir noted plaintiff's chronic pain again on October 29, 2007, and further noted on October 31 that plaintiff was using cocaine. (Tr. 329.)

On November 15, 2007, plaintiff was seen at Northwest Healthcare after having a possible heart attack and suffering left arm pain and breathing problems. Tests returned

normal results. (Tr. 345.) On November 16, plaintiff tested positive for benzodiazepines, cocaine, and Methadone. (Tr. 340.) On November 20, plaintiff tested positive for cocaine and Methadone use. (Tr. 322, 341-42.) Plaintiff admitted to Dr. Baskir that he used cocaine on Thanksgiving. (Tr. 329.) On December 4, plaintiff tested positive for Methadone use. (Tr. 324, 344.)

On December 28, 2007, plaintiff told Dr. Baskir that he wanted help to quit smoking. Plaintiff also continued to complain of back pain. (Tr. 330.)

On January 15 and 16, 2008, Dr. Baskir noted that plaintiff claimed to have lost his medicine and that he had a history of deep vein thrombosis, chest pain, and other pain. (Tr. 331, 350.)

A Myocardial Spect Scan conducted at DePaul Health Center on January 28, 2008, revealed normal appearing left ventricular wall motion and volume. The test revealed no diagnostic ST segment abnormalities upon exercise, and a fair functional capacity was noted. Plaintiff did not complain of any chest pains during the exercise. (Tr. 357-58.)

On February 22, 2008, Dr. Baskir diagnosed plaintiff with superficial thrombophlebitis[11] and chronic pain. (Tr. 352.)

On February 28, 2008, plaintiff saw Victoria Dorr, M.D., at Hematology Oncology Consultants, Inc. Dr. Dorr noted superficial thrombophlebitis, GERD, some fatigue, and minor/moderate discomfort, but that plaintiff was otherwise doing very well. Dr. Dorr also noted that plaintiff's mood and judgment appeared normal but that plaintiff also appeared very jittery. Dr. Dorr assessed plaintiff with recurrent thrombophlebitis related to an abnormal protein S; hepatitis C; history of tuberculosis but untreated due to his liver; depression; and a history of substance abuse. On March 10, Dr. Dorr reviewed plaintiff's blood tests and recommended that plaintiff take Coumadin indefinitely. (Tr. 381-83.)

On March 12, 2008, plaintiff saw Michael Stotler, M.D. Dr. Stotler diagnosed plaintiff with bipolar disorder. Dr. Stotler noted plaintiff's financial stress and drug use,

---

[11] Thrombophlebitis is venous inflammation with thrombus formation. *Stedman's Medical Dictionary* 1985 (28th ed. 2006).

and that plaintiff's polysubstance abuse and heroin and cocaine dependence were in remission. Plaintiff was taking Coumadin, Klonopin, Seroquel, Methadone, and Lamictal. Dr. Stotler noted plaintiff to have appropriate affect, normal speech, depressed mood, intact thought process and memory, and intact attention and concentration. (Tr. 368-72.)

On March 14, 2008, plaintiff was admitted to DePaul Health Center with admitting diagnoses of depression, polysubstance abuse, chronic back ache, hepatitis C, exposure to tuberculosis, and uncontrolled psychiatric illness. Plaintiff was assigned a GAF score of 35[12] at the time of admission. Discharge diagnoses were bipolar disorder, polysubstance abuse as shown by the presence of cocaine in his urine, and chronic back pain. (Tr. 347-48.)

On March 23, 2008, Dr. Baskir noted that plaintiff was unable to sleep at night. Dr. Baskir continued to diagnose chronic pain, leg pain, and depression. (Tr. 353.) On April 1, Dr. Baskir noted that plaintiff suffered from heartburn, depression, and chronic pain. (Tr. 354.)

On April 8, 2008, Dr. Stotler noted that plaintiff was depressed, had poor motivation, was unable to sleep, had a poor appetite, and had not used drugs in four to six weeks. Plaintiff's thought process was logical and sequential, and his judgment was fair. Dr. Stotler assigned a GAF score of 54. (Tr. 373.)

On April 11, 2008, Dr. Baskir diagnosed plaintiff with deep vein thrombosis. On May 9 and June 19, plaintiff continued to complain of chronic pain. Dr. Baskir noted that plaintiff was more active but complained of reflux. Dr. Baskir also noted that plaintiff was smoking three packs of cigarettes daily. (Tr. 355-56.)

---

[12] A GAF score between 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking,

**Letters**

In a letter dated June 3, 2008, Diane Flaherty, Certified Advanced Substance Abuse Counselor, described plaintiff's former substance abuse and transition to sobriety. (Tr. 375.)

In a letter dated June 5, 2008, Marquita Johnson, Probation Officer, detailed plaintiff's successful completion of the special conditions imposed by the court, as well as plaintiff's negative drug tests and consistency in taking his mental health medications. (Tr. 376.)

In a letter dated June 9, 2008, Dr. Baskir described his history of treating plaintiff and wrote that plaintiff was a recovering chemical dependent and had a history of hepatitis C, deep venous thrombosis with protein S deficiency, chronic low back pain, and bipolar disorder. Dr. Baskir also noted that plaintiff suffered from nicotine addiction, was developing early chronic obstructive pulmonary disease, and had a history of a positive PPD that could not be treated because of his hepatitis. Dr. Baskir also wrote that plaintiff's hepatitis C could not be treated until his bipolar disorder was under control; that plaintiff was at "bleeding risk" because he was taking Coumadin and Methadone; that plaintiff could not sit or stand more than one to two hours continuously because of back pain; and that plaintiff's opportunities for gainful employment were extremely limited because of his chronic pain, behavioral disorder, and potential sedation caused by medication. (Tr. 378.)

In a letter dated June 12, 2008, Dr. Stotler described his treatment of plaintiff and wrote that plaintiff had bipolar disorder and that his symptoms included depression, poor motivation, poor concentration, fatigue, racing thoughts, anger, irritability, and panic. Plaintiff's medications were noted to include Seroquel, Paxil, Vistaril, and Trazodone. Dr. Stotler opined that plaintiff was unable to work because of his conditions, and Dr. Stotler supported plaintiff's claim for disability. (Tr. 380.)

---

or mood (*e.g.*, depressed adult avoids friends, neglects family, and is unable to work).

On June 19, 2008, the ALJ sent Dr. Baskir a letter to clarify his reports/ medical source statements because: 1) they appeared to contain irreconcilable conflicts with the medical record, including plaintiff's failure to undergo hepatitis treatment as a result of his drug abuse; 2) they did not contain all information necessary to assess the severity of plaintiff's impairment, such as the medical basis for the severe limitations on sitting and standing; 3) they did not appear to be based upon medically acceptable clinical and laboratory diagnostic techniques; and 4) they did not adequately address what plaintiff could do despite his impairments. (Tr. 85.)

Also on June 19, 2008, the ALJ sent Dr. Sicuro a letter to clarify his reports/ medical source statements because: 1) they appeared to contain irreconcilable conflicts with the medical record, such as his GAF assessments of 60 and 65, given plaintiff's cocaine, heroin, and marijuana abuse and positive drug screens; 2) they did not contain all information necessary to assess the severity of plaintiff's impairments; and 3) they did not adequately address what plaintiff could do despite his impairments. (Tr. 87.)

## IV. Supplemental Medical Evidence Upon Remand

Plaintiff visited Dr. Baskir on March 30, 2009, for follow up of chronic back pain with radiation to the right leg and hip. Straight leg raising was positive bilaterally, and tenderness was noted about the lumbar spine on the right. It was noted that plaintiff was taking Depakote and Paxil as prescribed by his psychiatrist but no longer took Seroquel. Dr. Baskir refilled plaintiff's prescription for Methadone. It was noted that plaintiff wanted to wait until he was approved for disability before he began Interferon therapy. (Tr. 736-38.)

Plaintiff returned to Dr. Baskir on May 4, 2009, and complained of worsening pain and that he could not do yard work. Plaintiff reported that he was currently seeing a chiropractor. Physical examination showed plaintiff not to be in acute distress. No spinal tenderness was noted, but tenderness was noted about the sacroiliac bilaterally. Dr. Baskir refilled plaintiff's Methadone prescription. (Tr. 739-40.)

On June 2, 2009, plaintiff visited Dr. Baskir after having cut his arm at a junkyard

the previous day. Plaintiff also complained that he had trouble going up and down stairs and was restricted in his lifting because of back pain. Plaintiff also complained of depression and reported having thoughts about suicide but denied having any plan. Dr. Baskir advised plaintiff to see a psychologist and instructed plaintiff to continue with his psychotropic medications. Plaintiff's prescription for Methadone was refilled. (Tr. 741-43.)

Plaintiff was admitted to DePaul Health Center on June 28, 2009, and reported having suicidal and homicidal ideations. Plaintiff reported that he had not slept for five days. Plaintiff reported that he had been off of his medications, including his psychotropic medications, for several weeks. Plaintiff reported that his doctor stopped prescribing Methadone because of his recent relapse into cocaine use, and that he was now experiencing symptoms of Methadone withdrawal. Plaintiff reported having previously attempted suicide three or four times by drug overdose. Mental status examination showed plaintiff to be in mild psychomotor agitation. Plaintiff's mood was depressed and his affect was labile. Plaintiff's insight and judgment were poor, and he expressed suicidal ideas and plans as well as homicidal ideas. Dr. Vadim Baram diagnosed plaintiff with bipolar affective disorder, type 1, mixed without psychosis; opioid withdrawal; and opioid and cocaine dependence. Dr. Baram assigned a GAF score of 20.[13] During his hospitalization, plaintiff was noted to be intrusive and to show significant psychopathic tendencies. Plaintiff was noted to be focused on obtaining benzodiazepines and pain medications. "[A]n enormous amount of time" was needed to stabilize plaintiff's opioid withdrawal and reduce his anxiety level. After responding fairly well to high doses of Seroquel, plaintiff improved reasonably to be discharged. Plaintiff was discharged on July 8, 2009, and was noted to be alert and oriented, with an okay mood and reactive affect. Plaintiff denied having suicidal or homicidal ideations, and his insight and judgment were fair. Plaintiff was assigned a GAF score of 52.

---

[13] A GAF score of 11-20 indicates some danger of hurting self or others (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement), occasionally failing to maintain minimal personal hygiene (*e.g.*, smears feces), or gross

Plaintiff was provided Depakote, Doxepin, Lidocaine Patch, Paxil, Seroquel, and Warfarin upon discharge. Given plaintiff's pronounced psychopathic tendencies, Dr. Baram opined that plaintiff would most likely have a repeat cycle of hospitalizations. (Tr. 627-30.)

Plaintiff visited Dr. Baskir on July 28, 2009, who noted plaintiff's recent hospitalization. Plaintiff reported having decreased his smoking to one pack of cigarettes a day. Plaintiff reported recent cocaine and marijuana use in June 2009. Alternatives to narcotics were discussed for treatment of his chronic pain. (Tr. 745-47.)

Plaintiff returned to DePaul Health Center on October 17, 2009, with reported suicidal and homicidal ideations. Plaintiff reported having attempted suicide by overdose on cocaine and heroin. Plaintiff reported having relapsed on pain medications since his last hospitalization and that he was buying such medications on the street. Urine drug screening was positive for cocaine and opioids. Dr. Baram noted plaintiff not to be taking his prescribed medications regularly. Mental status examination showed plaintiff to have mild psychomotor agitation and to avoid eye contact. Plaintiff was noted to have poor grooming and impaired hygiene. Plaintiff's mood was depressed and his affect labile. Plaintiff had suicidal and homicidal ideations but no plan. Plaintiff's insight and judgment were noted to be poor. Plaintiff was assigned a GAF score of 20. Dr. Baram noted the need to clarify with Dr. Baskir plaintiff's need for Methadone. During hospitalization, plaintiff underwent medication management and psychotherapy. Plaintiff was discharged to Harris House on October 27, 2009, for continuation of chemical dependency treatment. Plaintiff was discharged with a GAF score of 52 and with prescribed medications including Naproxen, Depakote, Neurontin, Elavil, Paxil, Seroquel, and Coumadin. (Tr. 641-43.)

Plaintiff returned to Dr. Baskir on November 30, 2009, who noted plaintiff's recent hospitalization. Plaintiff reported having difficulty following through on tasks and of an inability to focus. Plaintiff continued to report smoking one pack of cigarettes a day. Plaintiff reported continued back pain but no longer with pain radiating down the

impairment in communication (*e.g.*, largely incoherent or mute).

leg.  Dr. Baskir advised plaintiff to remain active.  Plaintiff was prescribed Paroxetine. (Tr. 752-54.)

Plaintiff was admitted to DePaul Health Center on December 4, 2009, after an accidental overdose of morphine and aspirin.  Plaintiff denied this being a suicide attempt.  Plaintiff reported having obtained pain medication from his mother and morphine from another family member for back pain aggravated by bowling three days prior.  Plaintiff was assigned a GAF score of 20.  Plaintiff was transferred to the psychiatric unit on December 7 whereupon he underwent psychotherapy and medication management.  Plaintiff was discharged on December 9.  (Tr. 649-60.)

Plaintiff visited Dr. Stotler on December 18, 2009, who noted plaintiff to be pleasant and cooperative.  Plaintiff's mood was noted to be okay and his affect was full. Plaintiff's flow of thought was logical.  Plaintiff's insight and judgment were noted to be intact, but plaintiff demonstrated poor decision making skills.  Dr. Stotler noted plaintiff to have a lot of anger issues complicated by drug use.  Plaintiff reported feeling pretty stable on his current medications but complained of being tired and unmotivated.  Dr. Stotler diagnosed plaintiff with bipolar disorder, type I, depressed; and polysubstance abuse.  Plaintiff was assigned a current GAF score of 58, with 58 noted to be the highest GAF score within the previous year.  (Tr. 841-44.)

Plaintiff visited Dr. Baskir on January 25, 2010, who noted plaintiff's recent hospitalization.  Dr. Baskir also noted plaintiff to be seeing a pain specialist for back pain and that he was currently taking Ultram, Flexeril, and Motrin, which reportedly helped the pain somewhat.  Plaintiff reported having intermittent episodes of fatigue, which he attributed to depression.  Dr. Baskir noted plaintiff's hepatitis condition to be unchanged. Dr. Baskir also noted plaintiff's substance abuse and bipolar disorder to be unchanged. (Tr. 757-59.)

On April 16, 2010, plaintiff reported to Dr. Baskir that he was currently taking Vicodin, Flexeril, Gabapentin, and Motrin, and was receiving injections from his pain specialist.  Plaintiff complained of being under stress and requested a refill of Klonopin. Vistaril was prescribed for anxiety.  (Tr. 760-62.)

On June 29, 2010, Dr. Baskir noted that plaintiff completed injection therapy for his back pain but continued to experience pain. Plaintiff was also noted to no longer use cocaine but that he had increased his smoking to four packs of cigarettes a day. Plaintiff's current medications were noted to be Coumadin, Paroxetine, and Seroquel. (Tr. 763-64.)

Plaintiff returned to Dr. Stotler on July 15, 2010. His mental status was unchanged from his previous examination. Plaintiff reported that he stopped taking Paxil because it made him tired, but that he had been somewhat depressed and had poor activities of daily living since stopping the medication. Plaintiff also reported that he experienced chronic pain and was buying opiates on the street. Plaintiff reported that he did not want to stop taking opiates because they helped his chronic pain. Dr. Stotler continued in his diagnoses and assigned a GAF score of 58. (Tr. 835-40.)

Plaintiff visited Dr. Baskir on March 2, 2011, for urinary symptoms but reported that he wanted to be admitted to DePaul Health Center for detoxification from opiates. Dr. Baskir advised plaintiff to talk with his psychiatrist. No complaints were made regarding chronic pain, and physical examination showed no musculoskeletal tenderness. Plaintiff was diagnosed with urinary urgency, substance abuse, and primary hypocoagulable state. Fluoxetine was prescribed. (Tr. 772-73.)

Plaintiff visited Dr. Stotler on March 22, 2011, and reported that he continued to have some depression, anxiety, and recurrent suicidal ideations with no plan or intent. Plaintiff also complained of poor motivation, poor energy, excessive sleeping, and having a lot of stress. Dr. Stotler noted plaintiff's medications to include Clonazepam, Coumadin, Fluoxetine, and Seroquel. Mental status examination showed plaintiff to be depressed but to have logical and coherent thought process as well as good insight and judgment. Plaintiff's affect was noted to be full, stable, and appropriate. Plaintiff was diagnosed with bipolar disorder, type I, depressed – moderate; and polysubstance abuse. Dr. Stotler assigned a GAF score of 48 and instructed plaintiff to continue with Seroquel and Klonopin and to increase his dosage of Prozac. (Tr. 833-34.)

On September 13, 2011, plaintiff reported to Dr. Stotler that he had no depression,

mania, or anxiety, but that he still slept excessively. Plaintiff reported his energy to be good while awake. Plaintiff reported his participation at a Methadone clinic to be helping with his pain and opiate dependence, and he no longer used illicit drugs and had no other prescription pain medications. Mental status examination was normal. Dr. Stotler diagnosed plaintiff with bipolar disorder, type I, depressed – mild; and assigned a GAF score of 48. Plaintiff was instructed to increase his dosage of Klonopin. (Tr. 831-33.)

Plaintiff visited Dr. Baskir on October 17, 2011, and reported that he had been successfully granted disability benefits but needed to complete paperwork. Plaintiff complained of constant back pain that interfered with his sleep, and that he could not sit or stand for more than fifteen minutes at a time or lift more than five pounds. Plaintiff was prescribed Methadone and was instructed to follow up at the Methadone clinic. (Tr. 776-78.)

On November 1, 2011, Dr. Padda from the Center for Interventional Pain Management noted that plaintiff complained of bilateral knee pain and low back pain radiating to both legs. Straight leg raising was positive bilaterally. Plaintiff had limited range of motion about the cervical spine. (Tr. 728-29.)

On November 15, plaintiff reported to Dr. Padda that he experienced pain at a level nine on a scale of one to ten. Plaintiff was noted to have a normal gait. Straight leg raising was positive. (Tr. 723-27.)

Plaintiff returned to Dr. Baskir on April 25, 2012, and reported that he was seeing a new psychiatrist. Plaintiff reported that he had been taking Xanax, which controlled "things well enough." It was noted that plaintiff was not using street drugs. Dr. Baskir noted plaintiff's hepatitis condition to be unchanged. No complaints regarding chronic pain were noted. Plaintiff was prescribed Seroquel and Methadone. (Tr. 786-88.)

On June 20, 2012, plaintiff reported to Dr. Baskir that he had been "detoxed" off of all medication except for Xanax, and that he had been clean for twenty days. Plaintiff complained of having no energy. Plaintiff's current medications were noted to be Seroquel, Coumadin, Fluoxetine, and Methadone. Physical examination was unremarkable. (Tr. 793-95.)

Plaintiff returned to Dr. Stotler on June 20, 2012, and reported that he had been seeing another psychiatrist and was experiencing no depression, mania, or anxiety. Plaintiff reported his withdrawal from opiates to have ended. Plaintiff reported that he stopped taking Klonopin but that he was taking Xanax, which his wife provided him. Plaintiff reported needing Xanax to keep him well. Mental status examination was normal. Plaintiff was prescribed Xanax and Celexa and was instructed to increase his dosage of Klonopin. (Tr. 830-31.)

On July 9, 2012, plaintiff reported to Dr. Baskir that he recently underwent cholecystectomy[14] and no longer experienced fatigue. Plaintiff's current medications included Citalopram, Seroquel, and Coumadin. Physical examination was unremarkable. Plaintiff was instructed to return in three months. (Tr. 797-99.)

Plaintiff visited Dr. Padda on July 18, 2012, and reported his pain to be at a level ten. (Tr. 721.) Straight leg raising was positive bilaterally, and sacroiliac compression was noted bilaterally. Tests were ordered. (Tr. 718.)

An MRI of the lumbar spine taken July 25, 2012, showed broad-based left foraminal protrusion of the L4-L5 disc, apparently associated with compression of the exiting left L4 nerve in the foramen and displacement of the traversing left L5 nerve in the recess; severe degenerative changes of the right facet at L4-L5 and mild degenerative changes of bilateral facets at L5-S1; and posterior protrusion of the L5-S1 disc associated with possible impingement upon bilateral traversing S1 nerves in the recesses and the exiting right L5 nerve foramen. (Tr. 676-77.)

On August 1, 2012, plaintiff reported to Dr. Padda that he was experiencing more pain and was taking more pain medication. (Tr. 715.) Plaintiff continued to have positive straight leg raising and sacroiliac compression. (Tr. 712.) Facet joint steroid injections were administered to the lumbar spine. (Tr. 713.)

Plaintiff visited Dr. Baskir on August 8, 2012, and reported that he was back to

---

[14] Gallbladder removal. *Tests & Procedures, Cholecystectomy (gallbladder removal),* Mayo Foundation for Medical Education and Research (Feb. 25, 2014), *available at* < http://www. mayoclinic.org/tests-procedures/cholecystectomy/expert-

full activity. Plaintiff reported Celexa to cause fatigue. It was noted that plaintiff was scheduled for a back injection the following week. Plaintiff's chronic pain was noted to be unchanged. Plaintiff was prescribed Amitriptyline. (Tr. 804-06.)

On August 22, 2012, plaintiff reported to Dr. Padda that his back pain was at a level four and was currently the same as it was before his last treatment. (Tr. 709.) Straight leg raising and sacroiliac compression were negative. (Tr. 706.) Facet joint steroid injections were administered to the lumbar spine. (Tr. 707.)

Plaintiff returned to Dr. Padda on September 12, 2012, and reported his pain to be at a level eight and that he was taking more pain medication. (Tr. 703.) Straight leg raising was positive bilaterally. Sacroiliac compression was negative. Selective nerve root block was administered to the lumbosacral spine. (Tr. 701.) On September 19, plaintiff reported to Dr. Padda that his pain was currently at a level nine and that he was having difficulty coping with the pain. Plaintiff also reported being much less active since his last treatment. (Tr. 697.)

On September 25, 2012, plaintiff reported to Dr. Stotler that he had been having manic episodes with impulsiveness, shoplifting, racing thoughts, and decreased sleep. No depression was noted. Mental status examination showed plaintiff to have increased rate and amount of speech, but was otherwise normal.
Dr. Stotler continued in his diagnosis of bipolar disorder, type I, depressed – mild; assigned a GAF score of 48; and added Trileptal to plaintiff's medication regimen. (Tr. 829-30.)

Plaintiff visited Dr. Padda on September 26, 2012, and reported his pain to be at a level ten. (Tr. 693.) Sacroiliac compression was positive bilaterally. Straight leg raising was negative bilaterally. (Tr. 690.) Facet joint steroid injections were administered to the lumbar spine. (Tr. 691.)

On October 17, 2012, plaintiff reported to Dr. Padda that his pain was at a level nine. Plaintiff reported being much more active, however. (Tr. 684.) Sacroiliac compression and straight leg raising were positive. (Tr. 681.) Sacroiliac joint steroid

injections were administered bilaterally.  (Tr. 682.)

Plaintiff visited Dr. Baskir on October 24, 2012, who noted that plaintiff complained of intermittent chest pain associated with anxiety.  Plaintiff also reported having difficulty with concentration.  Oxcarbazepine (Trileptal) was prescribed.  Plaintiff also reported occasional tingling in the right hand.  Plaintiff also reported having back pain and that he walks with a walking stick on occasion.  Physical examination showed positive straight leg raising bilaterally.  (Tr. 817-19.)

On October 24, 2012, Dr. Baskir completed a Physical RFC Questionnaire in which he reported plaintiff's diagnoses to be DVT – hypercoagulable state, chronic back pain, bipolar disorder, and hepatitis C.  Dr. Baskir reported plaintiff's symptoms to be low back pain, anxiety spells, poor concentration, chest pain, and intermittent abdominal pain.  Dr. Baskir reported that plaintiff's pain was constant and in the lower right back. Dr. Baskir reported that plaintiff's pain worsened with constant sitting, lifting, bending, prolonged standing, and with sleep.  Dr. Baskir reported that positive straight leg raising tests were objective signs of plaintiff's pain.  Dr. Baskir opined that plaintiff's depression and anxiety affected his physical conditions.  Dr. Baskir opined that plaintiff's pain and other symptoms constantly interfered with his attention and concentration, and that plaintiff would be incapable of low stress jobs because of high levels of anxiety and constant low back pain.  Dr. Baskir opined that plaintiff could walk one city block without rest or severe pain; could sit for fifteen minutes at one time before needing to get up, and could sit for a total of less than two hours in an eight-hour workday; could stand for fifteen minutes at one time before needing to sit or walk, and could stand and/or walk for a total of less than two hours in an eight-hour workday.  Dr. Baskir opined that plaintiff would need to walk for seven minutes every fifteen minutes during an eight-hour workday, would need to change positions at will, and would need to take eight unscheduled breaks throughout the day for a period of twenty minutes each.  Dr. Baskir also reported that plaintiff would need an assistive device while engaging in occasional standing or walking.  Dr. Baskir opined that plaintiff could occasionally lift and carry up to ten pounds.  Dr. Baskir opined that plaintiff should never twist, stoop, bend, crouch,

squat, or climb ladders or stairs.  Dr. Baskir estimated that plaintiff would be absent from work more than four days per month because of his impairments or treatment therefor. Dr. Baskir reported that plaintiff had experienced such symptoms and limitations since 1997.  (Tr. 731-35.)

On October 30, 2012, Dr. Stotler noted that plaintiff had returned to baseline with Trileptal, but that baseline for plaintiff nevertheless included poor focus and concentration, distractibility, and anxiety.  Mental status examination showed plaintiff's speech to be increased, rambling, and unfocused; thought process was logical and coherent but showed flight of ideas; plaintiff was disheveled but was appropriately dressed; and he had a constricted, but stable and appropriate affect.  Dr. Stotler continued in his diagnosis and GAF score.  (Tr. 828-29.)

On October 30, 2012, Dr. Stotler completed a Mental RFC Questionnaire in which he reported that plaintiff suffered from bipolar disorder, type I, depressed.  Dr. Stotler reported that plaintiff took his medications as prescribed with improvement, but that he continued to be significantly impaired at baseline with poor motivation and concentration.  Dr. Stotler reported that plaintiff took Seroquel, Trileptal, and Xanax with a reported side effect of sedation.  Dr. Stotler listed plaintiff's signs and symptoms of his impairment, including decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impairment in impulse control, persistent anxiety, mood disturbance, difficulty concentrating, substance dependence, bipolar syndrome, emotional lability, flight of ideas, memory impairment, and sleep disturbance.  Dr. Stotler reported the severity of plaintiff's impairment to be demonstrated by plaintiff's tardiness and inconsistency with appointment times, poor focus, poor historian, and mood swings in the office.  Dr. Stotler opined that plaintiff had no useful ability to function or was unable to meet competitive standards in mental abilities and aptitudes needed to do unskilled work, semiskilled work, and skilled work.  Dr. Stotler opined that plaintiff was seriously limited, but not precluded, in his ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation.  Dr. Stotler also reported that plaintiff's mental condition exacerbated his

experience of pain and other physical symptoms, stating that "depression always makes perception worse – of pain, negativity, others' actions." Dr. Stotler opined that plaintiff would miss work more than four days a month because of his impairments or treatment therefor. Dr. Stotler added in conclusion, "Job history is very inconsistent, has never been able to hold a job. [Patient] is not dependable. Also has medical conditions that limit his ability to work including Hepatitis C." (Tr. 820-24.)

## V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found plaintiff's degenerative disc disease of the lumbar spine, bipolar disorder, and polysubstance abuse were severe impairments but that they did not, either singly or in combination, meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings), prior to May 21, 2012.

The ALJ determined that beginning May 21, 2012, plaintiff also had the severe impairment of broad-based forminal protrusion of the L4-L5 disc and that such impairment met the criteria of Listing 1.04A of the Listings of Impairments, thus rendering plaintiff disabled as of that date. The ALJ found that, prior to May 21, 2012, plaintiff had the RFC to perform light work[15] except that he could not climb ropes, ladders, or scaffolds; could only occasionally climb stairs and ramps; could only occasionally stoop, kneel, and crouch; had to avoid concentrated exposure to unprotected heights and vibrations; could understand, remember, and carry out at least simple instructions and non-detailed tasks; could demonstrate adequate judgment to make simple work-related decisions and adapt to routine/simple work changes; and could respond appropriately to supervisors and coworkers. The ALJ found that plaintiff's RFC

---

[15] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time

precluded him from performing his past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ found that vocational expert testimony supported a finding that plaintiff could perform work that exists in significant numbers in the national economy, and specifically, as a cashier II and as a mail clerk. The ALJ thus found that plaintiff was not disabled prior to May 21, 2012. (Tr. 403-16.)

## VI. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's

with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

A.     Weight Accorded to Dr. Baskir's Hepatitis C RFC Questionnaire

At step 2 of the sequential analysis, the ALJ found that plaintiff's hepatitis C condition was not a severe impairment. Although the ALJ noted the condition caused fatigue and that plaintiff needed Interferon treatment, he determined that the evidence failed to show how this impairment more than minimally limited plaintiff's ability to perform basic work activities. In making this determination, the ALJ specifically accorded little weight to Dr. Baskir's Hepatitis C RFC Questionnaire. (Tr. 406.) Plaintiff claims that the ALJ erred by discounting Dr. Baskir's opinions reflected in this Questionnaire inasmuch as no other medical evidence contradicts Dr. Baskir's conclusions.

As noted above, this cause was previously before the Court on plaintiff's appeal for judicial review of the Commissioner's adverse decision from July 2008. In that earlier appeal, plaintiff raised the same claim that he raises here: that the ALJ erred in discounting Dr. Baskir's January 2007 RFC Questionnaire. *See* Cause No. 4:10CV373 SNLJ/DDN, *Pltf.'s Brief in Supp. of Compl.*, Doc. #17 at pp. 19-23. In the Report and Recommendation entered in that cause, the undersigned addressed the merits of this

claim, finding specifically that the ALJ did not err in rejecting Dr. Baskir's opinion. *Id.*, *Report & Recommendation*, Doc. #23 at pp. 23-25. In the final Order and Judgment disposing of the case, Judge Limbaugh sustained and adopted the Report and Recommendation, incorporating it into the Judgment. *Id.*, *Order & Judgment*, Doc. #24.

The law-of-the-case doctrine generally prevents relitigation of an issue previously resolved, and requires courts to adhere to decisions rendered in earlier proceedings. *Hulsey v. Astrue*, 622 F.3d 917, 924 (8th Cir. 2010). Although neither party raises the doctrine here, a reviewing court may raise the law-of-the-case doctrine *sua sponte*, given the strong interest in avoiding repetitive litigation. *Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1134-35 (8th Cir. 2007). Upon review of the entirety of the record, including the parties' briefs in both cases and the Court's prior determination, the undersigned concludes that the doctrine precludes plaintiff from arguing here that the ALJ erred in discounting Dr. Baskir's January 2007 Hepatitis C RFC Questionnaire.

Although additional evidence was submitted to the ALJ upon remand and is before the Court on this review, such evidence does nothing to undermine the prior analysis and conclusion on this same question. The new evidence, beginning with treatment rendered by Dr. Baskir in March 2009 and including plaintiff's testimony at the November 2012 hearing, does not support a finding that Dr. Baskir's January 2007 opinion is now entitled to greater weight. This is particularly so given that Dr. Baskir's additional treatment notes - dated March 2009 through October 2012 – rarely refer to plaintiff's hepatitis and state only that such condition was "unchanged." Although the law-of-the-case doctrine does not preclude a different conclusion on the same issue if the adjudicator is presented with substantially different evidence, *Hulsey*, 622 F.3d at 925, it cannot be said that the new evidence here relating to plaintiff's hepatitis C is substantially different such that Dr. Baskir's January 2007 Hepatitis C RFC Questionnaire should now be viewed in a different light.

Because plaintiff's claim that the ALJ erred in discounting Dr. Baskir's January 2007 RFC Questionnaire has already been determined on its merits by this Court, and nothing in the record justifies the reopening of this issue, plaintiff is barred from

relitigating the claim in this cause.

B.    Listing 1.04A – Disorders of the Spine

At step 3 of the sequential analysis, the ALJ found that plaintiff's impairments met Listing 1.04A of the Listings of Impairments as of May 21, 2012, the date plaintiff's back condition worsened on account of him falling down some stairs. The ALJ specifically noted the MRI results from July 2012 showed nerve root compression and severe degenerative disease; and that related examinations with Dr. Padda showed neuro-anatomic distribution of pain, limitation in motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight leg raising. (Tr. 414.) Plaintiff claims, however, that the ALJ erred by failing to find that plaintiff's impairments met Listing 1.04A prior to May 21, 2012; and specifically, erred by failing to discuss why the January 2007 MRI did not support such a finding.

As an initial matter, the undersigned notes that an ALJ does not err when he fails to explain in his decision why an impairment does not equal one of the listed impairments "as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). Because the ALJ's conclusion here – that plaintiff's back impairment did not meet Listing 1.04A prior to May 21, 2012 – is supported by the record, his failure to discuss reasons to support this finding was not error.

To be considered disabled at step 3 of the sequential analysis, plaintiff must show that his impairment meets all criteria of a listed impairment. *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010); *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). Accordingly, to meet Listing 1.04A prior to May 21, 2012, plaintiff must show that his disorder of the spine resulted in compromise of a nerve root or the spinal cord with

> evidence of  nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  Although plaintiff argues that the January

2007 MRI demonstrates that he meets this Listing, a review of the MRI fails to show any evidence of compromise of a nerve root or the spinal cord. Indeed, Dr. Benzinger interpreted the MRI results as showing only mild disease. *See Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) (ALJ did not err in finding claimant able to perform light work where diagnosis of degenerative disc disease was tempered by the words "mild" or "minimal"). These results are in stark contrast to the July 2012 MRI results that showed nerve compression, nerve displacement, possible nerve impingement, and severe degenerative changes, which properly formed the basis of the ALJ's determination that plaintiff's back impairment was of listing level severity in May 2012.

Nor does the evidence of record show that plaintiff's back impairment was of listing level severity at any time prior to May 2012. While examinations showed distribution of pain, limitation of motion of the spine, and positive straight-leg raising, there nevertheless was no evidence of nerve root compression or of compromised spinal cord until the July 2012 MRI. Accordingly, because the evidence shows plaintiff did not meet *all* of the criteria of Listing 1.04A prior to May 21, 2012, the ALJ did not err in finding plaintiff's back impairment did not meet the Listing. *Jones*, 619 F.3d at 969 (to match listing, claimant must show his impairment meets *all* specified medical criteria).

C.     Treatment Accorded to Opinion Evidence

Plaintiff claims that the medical opinion evidence of record supports a finding of disability prior to May 21, 2012, and that by discounting such evidence, the ALJ had no medical evidence upon which to base his RFC findings.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in

the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).; *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, a medical source's opinion that an applicant is "unable to work" involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit. *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Against this backdrop, the Court addresses the weight accorded by the ALJ to each treating physician's opinion(s) in this cause.

1. *Dr. Baskir*

As discussed *supra*, the ALJ did not err in discounting Dr. Baskir's January 2007 Hepatitis C RFC Questionnaire. With respect to Dr. Baskir's June 2008 letter, the ALJ accorded no weight to the opinions therein because Dr. Baskir failed to acknowledge that plaintiff had been disqualified from Interferon treatment for his hepatitis C because of his

polysubstance abuse; and because he was not qualified to give a vocational opinion that plaintiff's "opportunities for employment are extremely limited." For the following reasons, this was not error.

An ALJ may discount a treating physician's opinion as to a claimant's functional limitations if the opinion fails to account for the claimant's noncompliance with treatment and medication instructions. *Owen v. Astrue*, 551 F.3d 792, 799-800 (8th Cir. 2008). A claimant's failure to abstain from illegal drug use, after being ordered to do so by a physician because such drug use would hinder necessary treatment or cause medically adverse effects, can be considered noncompliance. *See Wildman v. Astrue*, 596 F.3d 959, 964-65 (8th Cir. 2010); *Owen,* 551 F.3d at 800. Because Dr. Baskir's June 2008 opinion failed to account that plaintiff's drug use prevented him from participating in the recommended Interferon treatment, the ALJ did not err in discounting the opinion.

Likewise, the ALJ did not err in discounting Dr. Baskir's opinion that "opportunities for employment [were] extremely limited." A medical source's opinion that an applicant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion that the Commissioner must credit. *Ellis,* 392 F.3d at 994-95.

2.      *Dr. Stotler*

The ALJ accorded no weight to the opinions stated in Dr. Stotler's June 2008 letter. (Tr. 411-12.) To the extent Dr. Stotler stated in this letter that he supported plaintiff's claim for disability, the ALJ properly noted that a determination of disability is reserved to the Commissioner. *See Ellis*, 392 F.3d at 994-95.

The ALJ also discounted Dr. Stotler's summary of plaintiff's psychological history for the reason that it failed to account for the effects of plaintiff's polysubstance abuse and appeared to incorporate them with the effects of plaintiff's other mental impairments. However, an ALJ must base his initial disability determination on substantial evidence of a claimant's limitations "without deductions for the assumed effects of substance abuse disorders." *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2011). "Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's

expert opinion in the initial determination of the claimant's disability." *Id.* (citing 20 C.F.R. § 404.1527). "The inquiry here concerns strictly symptoms, not causes[.]" *Id.* The ALJ here determined to discount the symptoms set out in Dr. Stotler's June 2008 letter because Dr. Stotler failed to distinguish the cause of such symptoms. This was an improper basis upon which to discount the letter.

The ALJ also determined to discount Dr. Stotler's June 2008 letter because there were no treatment records from 2008 to support the statements. The ALJ then stated that the earliest treatment note from Dr. Stotler in the record is dated December 2009. (Tr. 412.) This is a factual error. As detailed above, the record contains treatment notes from Dr. Stotler beginning in March 2008, which is consistent with Dr. Stotler's statement in his letter that he began treating plaintiff at that time. In addition, Dr. Stotler's treatment notes from March and April 2008 show plaintiff to have exhibited some of the symptoms that Dr. Stotler reported in his June 2008 letter, and specifically, depression, poor motivation, and fatigue. For the ALJ to accord no weight to Dr. Stotler's June 2008 letter on account of a purported lack of supporting evidence from Dr. Stotler during the relevant time frame was error.

To the extent the ALJ accorded little weight to Dr. Stotler's October 2012 RFC Questionnaire, the undersigned notes that the ALJ again reasoned that Dr. Stotler failed to distinguish the effects of plaintiff's polysubstance abuse, which, for the reasons stated above, was error. In addition, the ALJ stated that the value of the October 2012 opinion was "undermined" since it came four months after claimant was found to be disabled. However, retrospective opinions as to the effects of a claimant's impairments during a period of claimed disability can constitute relevant evidence that such impairments were disabling during that time. *See Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995). This is especially true here where there is corroborating evidence demonstrating that plaintiff experienced limitations on account of his mental impairment during the relevant time. *Id.* A review of the record shows that such corroborating evidence includes Dr. Stotler's own treatment notes prior to May 2012, plaintiff's multiple and continued reports to treating physicians of having suicidal and sometimes homicidal ideations, and plaintiff's multiple

psychiatric hospitalizations. Given this extensive evidence of plaintiff's mental impairments and their effects on plaintiff's functioning prior to May 21, 2012, without regard to whether any effects were caused by substance abuse, the ALJ erred in his determination to discount Dr. Stotler's October 2012 opinion on the basis that it was made four months after the relevant period.

Finally, the ALJ determined to discount Dr. Stotler's opinion because of "significant conflicts" between his assigned GAF scores and his treatment notes. Specifically, the ALJ noted that despite characterizing plaintiff's impairment as "mild" or "slight," Dr. Stotler nevertheless assigned GAF scores of 48 indicating serious limitations. While an ALJ may discount a treating physician's opinion because of its inconsistency with the physician's own treatment notes, *see Halverson v. Astrue,* 600 F.3d 922, 930 (8th Cir. 2010), including an inconsistency between the physician's opinion and assigned GAF scores, *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005), a review of the record as a whole fails to show conflicts so "significant" as to justify the little weight accorded to Dr. Stotler's opinion on the basis of inconsistent GAF scores. Indeed, plaintiff's total GAF history shows that, since September 2005 and prior to May 2012, plaintiff obtained GAF scores of 50 or below on nine occasions, with five of these scores being 30 or below indicating dangerous symptoms or an inability to function. To the extent plaintiff obtained seven scores above 50 during this time, the undersigned notes that three of these scores came upon plaintiff's discharge from psychiatric hospitalizations after intense treatment. The ALJ wholly failed to discuss or consider these numerous GAF scores that indicated serious or more extreme limitations. Without taking into consideration the entirety of plaintiff's GAF history, the ALJ's determination to discount the opinion of plaintiff's treating psychiatrist on the basis of his GAF scores was error. *See Pate-Fires v. Astrue*, 564 F.3d 935, 944-45 (8th Cir. 2009), and cases cited therein.

3.  *Dr. Sicuro*

The ALJ accorded little weight to Dr. Sicuro's October 2006 opinion for the reason that the opinion was unsupported by Dr. Sicuro's own treatment records and,

further, because Dr. Sicuro "lump[ed] together the effects of the claimant's polysubstance abuse with the effects of other impairments." (Tr. 412.) For the reasons discussed above, the ALJ's determination to discount Dr. Sicuro's opinion for failing to distinguish the effects of plaintiff's polysubstance abuse was error. In addition, the undersigned questions how Dr. Sicuro's opinion from October 2006 can be inconsistent with his treatment notes when the record contains only one treatment note from Dr. Sicuro prior to October 2006, at which time plaintiff had suicidal tendencies and a GAF score of 30. Nevertheless, a review of Dr. Sicuro's October 2006 statement appears to be internally inconsistent, given that Dr. Sicuro assigned a GAF score at that time of 60/65, indicating mild to moderate symptoms, while *simultaneously* opining that plaintiff experienced limitations so extreme that he would effectively be precluded from any employment. A treating physician's opinion may be given little weight because of its internal inconsistencies. *Anderson v. Barnhart*, 344 F.3d 809, 813 (8th Cir. 2003).

Nevertheless, as discussed above, central to the ALJ's decision to discount Dr. Sicuro's and Dr. Stotler's medical opinions was the physicians' failure to segregate the effects of plaintiff's polysubstance abuse from the effects of his other mental impairments. However, in cases involving evidence of substance abuse, an ALJ must determine disability using the standard five-step approach "without segregating out any effects that might be due to substance use disorders." *Brueggemann*, 348 F.3d at 694. It is only upon a finding of disability when the ALJ must consider which limitations would remain when the effects of substance abuse are absent. *Id.* at 694-95; 20 C.F.R. §§ 404.1535(a), 416.935(a). As such, to the extent the ALJ found plaintiff was not disabled prior to May 21, 2012, he improperly discounted the opinions of plaintiff's treating physicians by relying on a factor not relevant to the initial determination of disability. *Brueggemann*, 348 F.3d at 694.[16]

---

[16] To the extent the ALJ determined that plaintiff was disabled as of May 21, 2012, because his physical impairments met Listing 1.04A, the ALJ found that evidence of plaintiff's polysubstance abuse continuing beyond May 21, 2012, was not material to the

https://www.google.com/search?hl=en&source=hp&q=General+Electric+percolators&gb
v=2&oq=General+Electric+percolators&gs_l=heirloom-
hp.3..0i22i30l7.6156.38672.0.39297.62.33.14.15.5.0.312.4408.0j22j4j1.27.0....0...1ac.1.3
4.heirloom-hp..21.41.4191.uDRG-daHLJg

D.        RFC and Hypothetical Question Posed to Vocational Expert

The ALJ's determination to discount and/or disregard all of the opinion evidence from plaintiff's treating mental health providers left the record devoid of any substantial medical evidence upon which the ALJ could base an RFC finding regarding plaintiff's mental ability to work.  Because some medical evidence must support an RFC determination, *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010), it cannot be said that the ALJ's mental RFC determination here was supported by substantial evidence on the record as a whole.

Nevertheless, for the reasons stated *supra*, the ALJ improperly rejected Drs. Stotler's and Sicuro's opinions regarding plaintiff's mental impairments.  As such, it cannot be said that the resulting RFC and hypothetical question posed to the vocational expert adequately reflected plaintiff's impairments.  Therefore, the vocational expert's testimony that jobs exist that plaintiff can perform does not constitute substantial evidence on the record as a whole upon which the ALJ may base his determination that plaintiff is not disabled.  *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000).


**VII.  Conclusion**

The ALJ relied on an improper factor to discount the opinions of plaintiff's treating physicians regarding the effects of plaintiff's mental impairments on his ability to perform work-related functions.  Upon remand, the ALJ shall determine whether the "gross total" of plaintiff's limitations, *including* the effects of plaintiff's polysubstance abuse, demonstrates disability.  *Brueggemann*, 348 F.3d at 694-95.  Only upon such a finding shall the ALJ then distinguish the effects of plaintiff's polysubstance abuse and determine whether, in the absence of such abuse, the remaining effects of plaintiff's

determination.  (Tr. 415.)

impairments would continue to render him disabled.

If determination of plaintiff's RFC is necessary upon remand, the Commissioner is reminded that some medical evidence must support the ALJ's RFC determination. If upon remand the Commissioner continues to discount or disregard the existing opinions and records of plaintiff's treating mental health providers, and provides proper analysis and good reasons to do so, she is encouraged to obtain some medical evidence that addresses plaintiff's mental ability to function in the workplace, which may include contacting plaintiff's treating physician(s) to clarify plaintiff's limitations and restrictions in order to ascertain what level of work, if any, plaintiff was able to perform prior to May 21, 2012. *Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006).

Accordingly, the decision of the Commissioner is reversed and the matter is remanded for further proceedings consistent with this opinion. An appropriate Judgment Order is issued herewith.

_____
UNITED STATES MAGISTRATE JUDGE

Signed on June 10, 2014.